WILLIAM A. SMITH AND OTHERS, *v.* LEROX SWORMSTEDT AND OTHERS.

In 1844, the Methodist Episcopal Church of the United States, at a General Conference, passed sundry resolutions providing for a distinct, ecclesiastical organization in the slaveholding States, in case the annual conferences of those States should deem the measure expedient.

In 1845, these conferences did deem it expedient and organized a separate ecclesiastical community, under the appellation of the Methodist Episcopal Church South.

At this time there existed property, known as the Book Concern, belonging to the General Church, which was the result of the labors and accumulation of all the ministers.

Commissioners appointed by the Methodist Episcopal Church South, may file a bill in chancery, in behalf of themselves and those whom they represent, against the trustees of the Book Concern, for a division of the property.

The rule is well established that where the parties interested are numerous, and the suit is for an object common to them all, some of the body may maintain a bill on behalf of themselves and of the others; and a bill may also be maintained against a portion of a numerous body of defendants, representing a common interest.

The Methodist Church was divided. It was not a case of the secession of a part from the the main body. Neither division lost its interest in the common property.

The General Conference, of 1844, had the legitimate power thus to divide the church. In 1808, the General Conference was made a representative body, with six restrictive articles upon its powers. But none of these articles deprived it of the power of dividing the church.

The sixth restrictive article provided that the General Conference should not appropriate the profits of the Book Concern to any other purpose than for the benefit of the travelling ministers, their widows, &c.; and one of the resolutions of 1844 recommended to all the annual conferences to authorize a change in the sixth restrictive article. This was not imposed as a condition of separation, but merely a plan to enable the General Conference itself to carry out its purposes.

The separation of the church into two parts being legally accomplished, a division of the joint property by a court of equity follows, as a matter of course.

THIS was an appeal from the Circuit Court of the United States for the District of Ohio, which dismissed the bill.

The bill was originally filed in the names of Henry B. Bascom,

a citizen of Lexington, in the State of Kentucky; Alexander L. P. Green, a citizen of Nashville, in the State of Tennessee; Charles B. Parsons, a citizen of Louisville, in the State of Kentucky; John Kelly, a citizen of Wilson county, in the State of Tennessee; James W. Allen, a citizen of Limestone county, in the State of Alabama; and John Tevis, a citizen of Shelby county, in the State of Kentucky —

Against Leroy Swormstedt and John H. Power, agents of the "Book Concern" at Cincinnati, and James B. Finley, all of whom are citizens of the State of Ohio; and George Peck and Nathan Bangs, who are citizens of the State of New York; who are made defendants to this bill.

Bascom, Green, and Parsons were commissioners appointed by the Methodist Episcopal Church South, to demand and sue for the proportion belonging to it of certain property, and especially of a fund called the "Book Concern." Bascom having died whilst the suit was pending, William A. Smith, a citizen of Virginia, was substituted in his place. The other plaintiffs were supernumerary and superannuated preachers, belonging to the travelling connection of the said church south; and all the plaintiffs were citizens of other States than Ohio, and sued not only for themselves but also in behalf of all the preachers in the travelling connection of the church south, amounting to about fifteen hundred.

The defendants were Swormstedt and Power, agents of the Book Concern at Cincinnati, and Findley, all travelling preachers of the Methodist Episcopal Church, and citizens of Ohio; and the Methodist Book Concern a body politic, incorporated by an act of the General Assembly of Ohio, and having its principal office at Cincinnati, in that State.

The nature of the dispute and the circumstances of the case are set forth in the opinion of the court.

It was argued by *Mr. Stanberry*, for the appellants, and by *Mr. Badger* and *Mr. Ewing*, for the appellees.

The following extract from the brief of *Mr. Stanberry* explains the points which he made.

We claim, in the first place, that the division of the church was a valid act, and thereby the original church was divided into two churches equally legitimate, and that the members and beneficiaries in each have equal rights to their distributive share of all the property and funds.

Secondly. That if there was no valid division of the original church, but only a separation of the southern portion from the original church, yet, under the circumstances in which it was

made, the beneficiaries of this charity have not lost that charac-
by adhering to the church south, because the separation was
authorized by the highest official and legislative authority of the
church, and the beneficiaries living in the south had no choice
or alternative but adherence to that church or the total loss of
all church membership and privileges.

We will discuss these propositions in the order in which they
are stated, and as they are elaborated under the following points:

*The plaintiffs' points.* 1. Prior to 1844 the Methodist Episco-
pal Church in the United States was one church in doctrine and
organization. It was one in doctrine as a Methodist Church,
and one in organization as the Methodist Church in the United
States, with jurisdiction coextensive with the territorial limits of
the United States.

2. At the present time there is no such church *de facto* as to
unity of organization, as the Methodist Episcopal Church of
1844. There is no longer one Methodist Episcopal Church with
territorial jurisdiction coextensive with the United States, but
there are two churches instead, divided in territorial jurisdiction
by a fixed line, each existing by an independent organization,
exclusive of the other.

3. This dissolution of the unity of organization not only
exists *de facto* but *de jure;* not by unauthorized secession of a
part from the original body, but by a valid division of the ori-
ginal body into two parts equally legitimate, which division was
authorized by competent authority, in the plan of 1844, and has
since been consummated in accordance with its provisions.

4. The Book Concern is a charitable fund connected with the
Methodist Episcopal Church, the capital being devoted to the
publication and dissemination of religious books and papers,
and the profits to the support of the travelling, supernumerary,
superannuated, and deficient preachers of the church, and the
wives, widows, children, and orphans of travelling preachers.

5. This fund was founded by the travelling preachers, and
chiefly accumulated by their labor. It never belonged to the
church in absolute right, but was simply intrusted to its manage-
ment.

6. Before the division of the church the founders and the
beneficiaries of this fund were scattered over its entire territory,
as then constituted, and equally labored in its accumulation,
and were equally entitled to its dividends, without reference to
particular territorial location.

7. The lawful division of the church, territorially, into two
distinct churches, did not destroy this charity or affect the right
of the beneficiaries, but it necessarily required a change of
management, which, before the division, was by means of a

General Conference, having jurisdiction over all classes of the beneficiaries, wherever located, through the agency of annual conferences within the jurisdiction and subject to the control of the General Conference.

8. After such division, in the due administration of this charity, and as near as may be to its original foundation, each of the churches becomes the proper manager of so much of the fund as is to be distributed to the beneficiaries within its exclusive jurisdiction, through the agency of its own annual conferences.

9. That the division to be made of the capital and profits of this fund to each church should be made on the basis of the number of travelling preachers in 1844, each church to have the same proportion of the entire fund as the number of travelling preachers within its bounds. bore to the whole number then within the entire territory of the church prior to the division.

10. That the refusal of the annual conferences to agree to the amicable division of the fund, as proposed in the plan of 1844, and the continued refusal of the authorities of the northern church to recognize the church south, or the beneficiaries within its jurisdiction, as entitled to the management or any distributive share of the fund, make a case for the interposition of a court of equity.

11. If the division of the church was not a constitutional act, the beneficiaries within the jurisdiction of the church south, and who are now united to that church, have not forfeited their right to this charity.

12. The bill presents the proper parties and the proper case for the interference of this court, in order to the due administration of this charity, to meet the exigency arising out of the division of the church, whether the division was constitutional or not.

(Mr. Stanberry's argument, both in the opening and in the reply, was very elaborate upon all these points, and therefore cannot be reported for want of room. His view of the contingent nature of the resolutions of 1844, was as follows :)

I will here close the argument upon this question of the power of division, having shown its existence in every aspect — having shown it upon the true character of all Methodist organization, upon the usage of the church through all its history, and, finally, upon the express provisions and limitations embodied in the written articles.

If this ground is maintained, the division of the common charitable fund is a necessary result. If the church organization is divided, the temporalities of the church must also be divided, for the right of each of the divisions stands upon the same

ground — one claims it precisely in the same character with the other.

Various objections are stated in the answer, and in the resolutions of the conference of the church north, in 1848, to the present validity of the plan of division. They say, as it passed the General Conference, it was not absolute, but contingent in many particulars. That it was passed to meet the contingency of a future ascertained necessity for division, and that no such necessity was found to exist; that it was made to depend, in all its parts, upon the concurrence of all the annual conferences in the proposed change of the sixth restrictive rule, and no such concurrence was given; and, finally, that it depended upon the due observance by the church south, and all its societies and members, of the jurisdictional line of division, which line was afterwards, as they say, invaded and disregarded by some of the southern preachers and members.

None of these positions need be argued, except only the matter of the non-concurrence of the annual conferences in the proposed change of the sixth rule.

That part of the plan of separation which respects this matter has nothing to do with the other parts of the plan, or with the taking effect of the plan as a whole. The principal thing, the division, was not in any way referred to the northern annual conferences. That was a matter exclusively between the General Conference and the southern annual conferences, in which the northern conferences had no voice. In order to provide for the contingency of division — seeing that the division of the fund must follow — and to avoid any doubt, the General Conference asks the annual conferences for express authority, not merely to divide the fund according to the division of the church organization, but for general authority to dispose of the entire fund for such purposes in general, as two thirds of the General Conference might determine upon.

This general authority, which would sanction a total misapplication of the fund, the annual conferences refused to give.

Now, the plan in no way provides that the southern conferences should not have any of this fund, except by the consent of the annual conferences; but, in the exercise of its own discretion, by its own authority, and as its own act, the General Conference chose to ask the annual conferences so to modify the restrictive rule. The annual conferences refused, and that leaves the matter at large, as a question to be settled upon the rights of the parties consequent on the division. If after the division the south had no right to any part of this fund — if it had forfeited its right by the new organization — if the beneficiaries at the south had thereby lost their character as benefi-

ciaries, then, indeed, there would be some ground for putting us to show a new title by the consent of the annual conferences, or something else.   But the ground on which we stand is, that we have never for a moment lost our character as beneficiaries; that our title is equal to that of the north; and that the refusal of the annual conferences is the common case of a refusal to perform a. duty which drives the injured party into a court of justice.

The points made by the counsel for the appellees, were the following:

1. The first point was in answer to the one raised by Mr. Stanberry, namely, that the church was dissolved and destroyed by the action of the General Conference of 1844, and that two new churches have arisen out of its ruins.

In answer to the first two propositions of the complainants, involving this point, the defendants insist —

1st. That prior to 1844 the Methodist Episcopal Church was the only religious denomination bearing that name, and it was one in organization, discipline, and doctrine.   A large part, but not the whole territory of the United States, was contained within its organization — it did not extend to the United States' possessions on the Pacific; it did embrace Texas, then a foreign country; it had been extended, but it did not then extend to the Canadas; its boundaries had been variable, and its identity or unity, its organization or existence, had no necessary dependence upon territorial limits.

2d. From 1844 to the present time, the same Methodist Episcopal Church has continued to exist identical in name, organization, discipline, and doctrine, and under a regular succession of the same officers: some conferences in the slaveholding States have withdrawn from it; it has lost and gained individual members; and the United States' possessions on the Pacific have been received into its connection; but these changes have not affected its organization or destroyed its identity.

2. With respect to the property called the " Book Concern," (after examining the constitution of this fund, the counsel came to the following conclusions:)

I take it then as clear, by proof and by concession, that a Methodist Episcopal Church, having a regular and well known organization, existed prior to 1844, and that the property now in controversy was held by trustees, in trust for the church so organized, and for certain specified beneficiaries in it, and that it was only through connection with the church, in and through its organization, in a mode pointed out by its organic law,

25 *

Smith et al. *v.* Swormstedt et al.

that any individual was or could be entitled to any portion of the fund.

I hold it equally clear, and of like necessity it must be conceded, that if the Methodist Episcopal Church of 1844 still exists, and retains its identity, the trustees still hold the property in trust for it only, and that it is by connection with it as an organized body, and by and through it alone, that any individual is now entitled as a beneficiary, unless indeed the church has by compact, or some equivalent act, qualified the condition of the trust, and changed its direction; and that no individual members of the church, or any section of it, large or small, could by mere secession entitle himself or themselves to any portion of the trust fund, separate from and independent of the organized, still subsisting church.

3. Then, to entitle these complainants to recover, they must establish as facts:

1st. That the Methodist Episcopal Church, as it existed in and prior to 1844, was destroyed by the acts of the General Conference of 1844 — or by the act of the Louisville Convention of 1845, in the exercise of power conferred on it by the General Conference — and thenceforth ceased to exist as an organized body — that out of a portion of its severed elements a new church was formed, composed in part of individuals who, under the former organization, were beneficiaries of the fund, and that thus the expressed object of the charity, as also its means of administration, having failed, there being now no Methodist Episcopal Church to administer the charity, and no travelling preachers, &c., of the Methodist Episcopal Church to receive and enjoy it, a court of equity will apply the charity, not according to its terms, which is no longer possible, but *cy. pres,* as nearly as possible according to its original object, and, to this end, divide the fund *pro ratâ* between the fragments of the defunct church.

2d. Or that if the Methodist Episcopal Church of 1844 still exists, some act by the General Conference of that year has changed, in part, the direction of the fund and the medium of its administration.

(After discussing these propositions, the counsel came to the following conclusions:)

We find, then, on examining the bill and the book of Doctrine and Discipline, which is filed with and made part of it,

1st. That the General Conference is not, since 1808, an original body possessed of inherent powers, but representative merely, having no other powers than those conferred on it by the constitution which created it.

2d. That the general grant of powers to this conference

extends only to the making rules and regulations for the Methodist Episcopal Church, not to the division, dissolution, or destruction of the church.

3d. That the restrictive articles forbid, by clear implication, the division or destruction of the organized Methodist Episcopal Church.

4th. That under the sixth restrictive article the General Conference cannot " appropriate the produce of the Book Concern, nor of the Charter Fund, to any purpose other than for the benefit of the travelling, supernumerary, superannuated, and worn-out preachers " of the Methodist Episcopal Church, within its organization, " their wives, widows, and children; " nor can that conference by any act so involve the fund or place it in such situation that a court of equity can apply it to objects, or in a manner forbidden by the declaration of trust and the constitution of the Methodist Episcopal Church.

4. We will now proceed to show that the General Conference never assumed the power of destroying the organization of the Methodist Episcopal Church, or of severing or dissolving it, but as often as they have spoken distinctly upon the subject, have disclaimed the power, and that they did not, in the case at bar, exercise or attempt to exercise it.

(The argument upon this point was very extensive, involving an examination of the Canada case, and of the records of the conferences, concluding as follows :)

It is, then, so far as the thirteen southern and south-western conferences are concerned, a case of voluntary withdrawal from the Methodist Episcopal Church as organized, and the formation of a new and separate organization ; and I have already shown, that if the withdrawal be small or great, of one or many, the voluntary abandonment of the organized church is also the voluntary surrender of all the temporal privileges and immunities belonging to that organization.    And it is very clear that this trust-fund, which was intrusted in its administration to the annual conferences of this organization, cannot be transferred by a court of equity to a conference which has ceased to belong to that organization, any more than to one which never had belonged to it.    The southern conferences, now the Methodist Episcopal Church South, cannot, therefore, sustain their bill on the ground of former connection with the Methodist Episcopal Church, and of their present separate existence; and I have already shown that they cannot sustain it on the ground of contract.    It is equally clear that they cannot sustain it on the gound that the General Conference of 1844 had caused the southern conferences to believe that the Book Concern would be divided, and induced them to act according to that belief.    This point, however good

in law, fails as a matter of fact. There was no disguise, no concealment, no misrepresentation on the part of the General Conference, but the most open candor and directness; and the conferences south were fully advised — indeed, they advised themselves — that, in case of separation, a share of the Book Concern depended on the votes of the annual conferences, and they agreed that it did and should depend upon such vote. The church south, therefore, in its new organization, has no standing in court. The only remaining question which goes to the legal merits of the case is :

5. Do the individuals who join in this bill show any right to a distributive share of this fund ?

They show that they " are preachers — Kelley and Allen are supernumerary, and Tevis superannuated preachers — of the Methodist Episcopal Church South, and that as such they have a personal interest in the real estate, personal property, debts, and funds now holden by the Methodist Episcopal Church through said defendants, as agents and trustees appointed by the General Conference of the Methodist Episcopal Church." So much for themselves.

As to those whom they choose to represent, they say, " That there are about fifteen hundred preachers belonging to the travelling connection of the Methodist Episcopal Church South, each of whom has a direct personal interest in the same right as your complainants to the said property," &c.

They say they are members of the church south, preachers belonging to the travelling connection of that church, and on that ground, and that alone, they set up this claim. They do not aver that they, or any one of them, or any one for whom they appear, ever belonged to the Methodist Episcopal Church, and acquired rights in its connection ; but they simply claim that, by virtue of their connection with the Methodist Episcopal Church South, they are entitled to a distributive share of the property of the Methodist Episcopal Church. The case is certainly no better by making these persons complainants. If the church south be not entitled, as an organized body, on some ground shown in the bill, these persons are not entitled because they are members of its organization.

The case made by complainants' counsel for widows and orphans of travelling preachers of the Methodist Episcopal Church, who became entitled by the services of their husbands and fathers, but who, since their death, have by the mere force of circumstances been withdrawn from the Methodist Episcopal Church, and attached to the church south, if available at all, goes too far, entitles them to more than it has even contended that they have a claim to. If their relation to the Methodist Epis-

copal Church be not so sundered as to exonerate that church from their support, it is bound to support them out of whatsoever fund may be in its power, in common with the rest of its widows and orphans.   They are not entitled to a support out of the charter-fund and the produce of the Book Concern, but out of the funds of the various annual conferences of the Methodist Episcopal Church into which the produce of the Book Concern enters, and of which it forms a part merely, and, indeed, but a small part.   If entitled to any thing from the Methodist Episcopal Church since they ceased to belong to it, it is to their support, in whole or in part, according to their necessities, not to a distributive share of the produce of the Book Concern.

The separation of those who have passively suffered by the secession of so large a portion of the Methodist Episcopal Church from its ancient organization, is greatly to be commiserated and regretted, and the Methodist Episcopal Church is ready and anxious, in any possible mode, to reach and relieve them, for she still recognizes them as members.   But she cannot, consistently with her discipline, deliver any part of her funds to another church, alien in organization, though the same in faith, to be administered among them.   Nor can their necessities or their rights, if rights indeed they have, bring in and entitle ninety-five who voluntarily seceded, and who were active in secession, to come in and share in the funds of the Methodist Episcopal Church, with the five who were withdrawn from it by the mere force of circumstances.   But those who were passive in the separation, those who did not withdraw, but who were withdrawn from the Methodist Episcopal Church, are not before the court. The only individuals here who claim as parties for themselves, and those standing in a like situation, claim merely by virtue of their connection with the church south, and do not profess to have ever been members of the Methodist Episcopal Church.

This, it appears to me, is the truth and reason of this branch of the case ; and if so, no equitable right arises in their behalf. And this fund is not now wasted or scattered to the winds.   It is still applied strictly according to the terms and intent of the trust, in the very way in which the written declaration of the trust, known and understood by all, directs it.   Unhappily, some who enjoyed the benefit of the fund are withdrawn from the sphere of its application; others, perhaps, equally worthy and equally necessitous, are brought within it.   This case does not come within the principle of any of the cases cited by counsel on the other side, if the Methodist Episcopal Church has not been destroyed.   If it has, I admit the application of the cases. For while that church exists it is a trustee, in its various organism, to administer the charity, and the beneficiaries described by the declaration of trust are to be found within its bosom.   **The**

trustee, the charity, the beneficiaries, have not failed, but merely certain individuals have ceased to be beneficiaries.

6. Certain it is, that this separation took place either by secession or by contract, the General Conference offering terms of separation, and the southern conferences acceding to them.

If the latter be the case, the condition precedent to the distribution of the charter-fund and Book Concern was also agreed upon ; namely, the consent of the annual conferences.

If the southern conferences seceded without a contract, the legal consequences of simple secession follow. Those I have considered.

If with a contract, that contract is the law of the secession. And all that a court of equity can do is to compel the parties to carry out the contract in good faith.

7. The blame of the separation is cast by complainants on the Methodist Episcopal Church. It is contended, that the secession of the southern conferences was not only justified, but compelled, by the continued agitation of the slavery question in the northern annual conferences, and also in the General Conference itself. And more especially, say they, it was compelled by the illegal and oppressive acts of the General Conference of 1844, in the cases of Harding and Bishop Andrew. These matters of complaint I will now consider. And,

1st. The agitation of the slavery question in the Methodist Episcopal Church.

(The argument upon this branch of the subject is omitted.)

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the District of Ohio.

The bill is filed by the complainants, for themselves, and in behalf of the travelling and worn out preachers in connection with the society of the Methodist Episcopal Church South in the United States, against the defendants, to recover their share of a fund called the Book Concern, at the city of Cincinnati, consisting of houses, machinery, printing-presses, book-bindery, books, &c., claimed to be of the value of some two hundred thousand dollars.

The bill charges that, at and before the year 1844, there existed in the United States a voluntary association unincorporated, known as the Methodist Episcopal Church, composed of seven bishops, four thousand eight hundred and twenty-eight preachers belonging to the travelling connection, and in bishops, ministers, and members about one million one hundred and nine thousand nine hundred and sixty, united, and bound together in one organized body by certain doctrines of faith and morals, and by certain rules of government and discipline.

That the government of the church was vested in one body called the General Conference, and in certain subordinate bodies called annual conferences, and in bishops, travelling ministers, and preachers.

The bill refers to a printed volume, entitled " The Doctrines, and Discipline of the Methodist Episcopal Church," as containing the constitution, organization, form of government, and rules of discipline, as well as the doctrines of faith of the association.

The complainants further charge, that differences and disagreements had sprung up in the church between what was called the northern and southern members, in respect to the administration of the government with reference to the ownership of slaves by the ministers of the church, of such a character and attended with such consequences as threatened greatly to impair its usefulness, as well as permanently to disturb its harmony; and it became and was a question of grave and serious importance whether a separation ought not to take place, according to some geographical boundary to be agreed upon, so as that the Methodist Episcopal Church should thereafter constitute two separate and distinct organizations. And that, accordingly, at a session of the General Conference held in the city of New York in May, 1844, a resolution was passed by a majority of over three fourths of the body, by which it was determined, that, if the annual conferences of the slaveholding States should find it necessary to unite in a distinct ecclesiastical connection, the following rule should be observed with regard to the northern boundary of such connection — all the societies, stations, and conferences adhering to the church in the south, by a vote of a majority of the members, should remain under the pastoral care of the southern church; and all adhering to the church north, by a like vote, should remain under the pastoral care of that church. This plan of separation contains eleven other resolutions relating principally to the mode and terms of the division of the common property of the association between the two divisions, in case the separation contemplated should take place; and which, in effect, provide for a *pro ratâ* division, taking the number of the travelling preachers in the church north and south as the basis upon which to make the partition.

The complainants further charge that, in pursuance of the above resolutions, the annual conferences in the slaveholding States met, and resolved in favor of a distinct and independent organization, and erected themselves into a separate ecclesiastical connection, under the provisional plan of separation based upon the discipline of the Methodist Episcopal Church, and to

be known as the Methodist Episcopal Church South. And they insist that, by virtue of these proceedings, this church, as it had existed in the United States previous to the year 1844, became and was divided into two separate churches, with distinct and independent powers, and authority composed of the several annual conferences, stations, and societies, lying north and south of the aforesaid line of division. And, also, that by force of the same proceedings, the division of the church south became and was entitled to its proportion of the common property real and personal of the Methodist Episcopal Church, which belonged to it at the time the separation took place; that the property and funds of the church had been obtained by voluntary contributions, to which the members of the church south had contributed more than their full share, and which, down to the time of the separation, belonged in common to the Methodist Episcopal Church, as then organized.

The complainants charge, that they are members of the church south, and preachers, some of them supernumerary, and some superannuated preachers, and belonged to the travelling connection of said church; and that, as such, have a personal interest in the property, real and personal, held by the church north, and in the hands of the defendants; and, further, that there are about fifteen hundred preachers belonging to the travelling connection of the church south, each of whom has a direct and personal interest in the same right with the complainants in the said property, the large number of whom make it inconvenient and impracticable to bring them all before the court as complainants.

They also charge, that the defendants are members of the Methodist Episcopal Church North; and that each, as such, has a personal interest in the property; and further, that two of them have the custody and control of the fund in question; and that, in addition to these defendants, there are nearly thirty-eight hundred preachers belonging to the travelling connection of the church north, each of whom has an interest in the fund in the same right, so that it is impossible, in view of sustaining a just decision in the matter, to make them all parties to the bill.

The complainants also aver, that this bill is brought by the authority, and under the direction of the general and annual conferences of the church south, and for the benefit of the same, and for themselves, and all the preachers in the travelling connection, and all other ministers and persons having an interest in the property.

The defendants, in their answer, admit most of the facts charged in the bill, as it respects the organization, government;

discipline, and faith of the Methodist Episcopal Church as it existed at and previous to the year 1844. They admit the passage of the resolutions, called the plan of separation, at the session of the General Conference of that year, by the majority stated; but deny that the resolutions were duly and legally passed; and also deny that the General Conference possessed the competent power to pass them, and submit that they were therefore null and void. They also submit that, if the General Conference possessed the power, the separation contemplated was made dependent upon certain conditions, and among others a change of the sixth restrictive article in the constitution of the church, by a vote of the annual conferences, which vote the said conferences refused.

The defendants admit the erection of the church south into a distinct ecclesiastical organization; but deny, that this was done agreeably to the plan of separation. They deny that the Methodist Episcopal Church, as it existed in 1844, or at any time, has been divided into two distinct and separate ecclesiastical organizations; and submit that the separation and voluntary withdrawal from this church of a portion of the bishops, ministers, and members, and organization into a church south, was an unauthorized separation; and that they have thereby renounced and forfeited all claim, either in law or equity, to any portion of the property in question. The defendants admit that the Book Concern at Cincinnati, with all the houses, lots, printing-presses, &c., is now and always has been beneficially the property of the preachers belonging to the travelling connection of the Methodist Episcopal Church; but insist that, if such preachers do not, during life, continue in such travelling connection, and in the communion, and subject to the government of the church, they forfeit for themselves and their families all ownership in, or claim to the said Book Concern, and the produce thereof; they admit that the Book Concern was originally commenced and established by the travelling preachers of this church, upon their own capital, with the design in the first place of circulating religious knowledge, and that, at the General Conference of 1796, it was determined that the profits derived from the sale of books should in future be devoted wholly to the relief of travelling preachers, supernumerary and worn out preachers, and the widows and orphans of such preachers — and the defendants submit that the Methodist Episcopal Church South is not entitled at law or in equity to have a division of the property of the Book Concern, or the produce, or to any portion thereof; and that the ministers, preachers, or members, in connection with such church are not entitled to any portion of the same; and further, that being no

longer travelling preachers belonging to the Methodist Episcopal Church, they are not so entitled, without a change of the sixth restrictive article of the constitution of 1808, provided for in the plan of separation, as a condition of the partition of said fund.

The proofs in the case consist chiefly of the proceedings of the General Conference of 1844, relating to the separation of the church and of the proceedings of the southern conferences, in pursuance of which a distinct and separate ecclesiastical organization south took place.

There is no material controversy between the parties, as it respects the facts. The main difference lies in the interpretation and effect to be given to the acts and proceedings of these several bodies and authorities of the church. Our opinion will be founded almost wholly upon facts alleged in the bill, and admitted in the answer.

An objection was taken, on the argument, to the bill for want of proper parties to maintain the suit. We think the objection not well founded.

The rule is well established, that where the parties interested are numerous, and the suit is for an object common to them all, some of the body may maintain a bill on behalf of themselves and of the others; and a bill may also be maintained against a portion of a numerous body of defendants, representing a common interest. Story's Eq. Pl. §§ 97, 98, 99, 103, 107, 110, 111, 116, 120; 2 Mitf. Pl. (Jer. Ed.) 167, 2 Paige R. 19; 4 Mylne & Cr. 134, 619; 2 De Gex & Smale, 102, 122.

Mr. Justice Story, in his valuable treatise on Equity Pleadings, after discussing this subject with his usual research and fulness, arranges the exceptions to the general rule, as follows: 1. Where the question is one of a common or general interest, and one or more sue or defend for the benefit of the whole. 2. Where the parties form a voluntary association for public or private purposes, and those who sue or defend may fairly be presumed to represent the rights and interests of the whole; and 3. Where the parties are very numerous, and though they have or may have separate and distinct interests, yet it is impracticable to bring them all before the court.

In this latter class, though the rights of the several persons may be separate and distinct, yet there must be a common interest or a common right, which the bill seeks to establish or enforce. As an illustration, bills have been permitted to be brought by the lord of a manor against some of the tenants, and *vice versa*, by some of the tenants in behalf of themselves and the other tenants, to establish some right — such as suit to a mill, or right of common, or to cut turf. So by a parson of a

parish against some of the parishioners to establish a general right to tithes — or conversely, by some of the parishioners in behalf of all to establish a parochial modus.

In all cases where exceptions to the general rule are allowed, and a few are permitted to sue and defend on behalf of the many, by representation, care must be taken that persons are brought on the record fairly representing the interest or right involved, so that it may be fully and honestly tried.

Where the parties interested in the suit are numerous, their rights and liabilities are so subject to change and fluctuation by death or otherwise, that it would not be possible, without very great inconvenience, to make all of them parties, and would oftentimes prevent the prosecution of the suit to a hearing. For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court. The legal and equitable rights and liabilities of all being before the court by representation, and especially where the subject-matter of the suit is common to all, there can be very little danger but that the interest of all will be properly protected and maintained.

The case in hand illustrates the propriety and fitness of the rule. There are some fifteen hundred persons represented by the complainants, and over double that number by the defendants. It is manifest that to require all the parties to be brought upon the record, as is required in a suit at law, would amount to a denial of justice. The right might be defeated by objections to parties, from the difficulty of ascertaining them, or if ascertained, from the changes constantly occurring by death or otherwise.

As it respects the persons into whose hands the fund in question should be delivered for the purpose of distribution among the beneficiaries, in case of a division of it, we shall recur to the subject in another part of this opinion.

We will now proceed to an examination of the merits of the case.

The Book Concern, the property in question, is a part of a fund which had its origin at a very early day, from the voluntary contributions of the travelling preachers in the connection of the Methodist Episcopal Church. The establishment was at first small; but at present, is one of very large capital, and of extensive operations, producing great profits. In 1796, the travelling preachers in General Conference assembled, determined that these profits should be thereafter devoted to the relief of the travelling preachers, and their families ; and, accord-

ingly resolved, that the produce of the sale of the books, after the debts were paid, and sufficient capital provided for carrying on the business, should be applied for the relief of distressed travelling preachers, for the families of travelling preachers, and for supernumerary and worn out preachers, and the widows and orphans of preachers.

The establishment was placed under the care and superintendence of the General Conference, the highest authority in the church, which was composed of the travelling preachers; and it has grown up to its present magnitude, its capital amounting to nearly a million of dollars, from the economy and skill with which the concern has been managed, and from the labors and fidelity of the travelling preachers, who have always had the charge of the circulation and sale of the books in the Methodist connection throughout the United States, accounting to the proper authorities for the proceeds. The agents who have the, immediate charge of the establishment make up a yearly account of the profits, and transmit the same to the several annual conferences, each, an amount, in proportion to the number of travelling preachers, their widows and orphans comprehended within it, which bodies distribute the fund to the beneficiaries individually, agreeably to the design of the original founders. These several annual conferences are composed of the travelling preachers residing or located within certain districts assigned to them; and comprehended, in the aggregate, the entire body in connection with the Methodist Episcopal Church. The fund has been thus faithfully administered since its foundation down to 1846, when the portion belonging to the complainants in this suit, and those they represent, was withheld, embracing some thirteen of the annual conferences.

In the year 1844 the travelling preachers in General Conference assembled, for causes which it is not important particularly to refer to, agreed upon a plan for a division of the Methodist Episcopal Church in case the annual conferences in the slaveholding States should deem it necessary; and to the erection of two separate and distinct ecclesiastical organizations. And, according to this plan, it was agreed that all the societies, stations, and conferences adhering to the church south, by a majority of their respective members, should remain under the pastoral care of that church; and all of these several bodies adhering, by a majority of its members, to the church north, should remain under the pastoral care of that church; and, further, that the ministers, local and travelling, should, as they might prefer, attach themselves, without blame, to the church north or south. It was also agreed that the common property of the church, including

this Book Concern, that belonged specially to the body of travelling preachers, should, in case the separation took place, be divided between the two churches in proportion to the number of travelling preachers falling within the respective divisions. This was in 1844. In the following year the southern annual conferences met in convention, in pursuance of the plan of separation, and determined upon a division, and resolved that the annual conferences should be constituted into a separate ecclesiastical connection, and based upon the discipline of the Methodist Episcopal Church, comprehending the doctrines and entire moral, ecclesiastical, and economical rules and regulations of said discipline, except only so far as verbal alterations might be necessary; and to be known by the name of the Methodist Episcopal Church South.

The division of the church, as originally constituted, thus became complete; and from this time two separate and distinct organizations have taken the place of the one previously existing.

The Methodist Episcopal Church having been thus divided, with the authority and according to the plan of the General Conference, it is claimed, on the part of the complainants, who represent the travelling preachers in the church south, that they are entitled to their share of the capital stock and profits of this Book Concern; and that the withholding of it from them is a violation of the fundamental law prescribed by the founders, and consequently of the trust upon which it was placed in the hands of the defendants.

The principal answer set up to this claim is, that, according to the original constitution and appropriation of the fund, the beneficiaries must be travelling preachers, or the widows and orphans of travelling preachers, in connection with the Methodist Episcopal Church, as organized and established in the United States at the time of the foundation of the fund; and that, as the complainants, and those they represent, are not shown to be travelling preachers in that connection, but travelling preachers in connection with a different ecclesiastical organization, they have forfeited their right, and are no longer within the description of its beneficiaries.

This argument, we apprehend, if it proves any thing, proves too much; for if sound, the necessary consequence is that the beneficiaries connected with the church north, as well as south, have forfeited their right to the fund. It can no more be affirmed, either in point of fact or of law, that they are travelling preachers in connection with the Methodist Church as originally constituted, since the division, than of those in connection with the church south. Their organization covers but about half of the

26 *

territory embraced within that of the former church; and includes within it but a little over two thirds of the travelling preachers. Their general conference is not the general conference of the old church, nor does it represent the interest or possess, territorially, the authority of the same; nor are they the body under whose care this fund was placed by its founders. It may be admitted that, within the restricted limits, the organization and authority are the same as the former church. But the same is equally true in respect to the organization of the church south.

Assuming therefore that this argument is well founded, the consequence is that all the beneficiaries of the fund, whether in the southern or northern division, are deprived of any right to a distribution, not being in a condition to bring themselves within the description of persons for whose benefit it was established: in which event the foundation of the fund would become broken up, and the capital revert to the original proprietors, a result that would differ very little in its effect from that sought to be produced by the complainants in their bill.

It is insisted, however, that the General Conference of 1844 possessed no power to divide the Methodist Episcopal Church as then organized, or to consent to such division; and hence, that the organization of the church south was without authority, and the travelling preachers within it separated from an ecclesiastical connection which is essential to enable them to participate as beneficiaries. Even if this were admitted, we do not perceive that it would change the relative position and rights of the travelling preachers within the divisions north and south, from that which we have just endeavored to explain. If the division under the direction of the General Conference has been made without the proper authority, and for that reason the travelling preachers within the southern division are wrongfully separated from their connection with the church, and thereby have lost the character of beneficiaries, those within the northern division are equally wrongfully separated from that connection, as both divisions have been brought into existence by the same authority. The same consequence would follow in respect to them, that is imputable to the travelling preachers in the other division, and hence each would be obliged to fall back upon their rights as original proprietors of the fund.

But we do not agree that this division was made without the proper authority. On the contrary, we entertain no doubt but that the General Conference of 1844 was competent to make it; and that each division of the church, under the separate organization, is just as legitimate, and can claim as high a sanction, ecclesiastical and temporal, as the Methodist Episcopal

Church first founded in the United States.   The same author-
ity which founded that church in 1784 has divided it, and esta-
blished two separate and independent organizations occupying
the place of the old one.

In 1784, when this church was first established, and down till
1808, the General Conference was composed of all the travelling
preachers in that connection.   This body of preachers founded
it by organizing its government, ecclesiastical and temporal,
established its doctrines and discipline, appointed its superin-
tendents or bishops, its ministers and preachers, and other sub-
ordinate authorities to administer its polity, and promulgate
its doctrines and teachings throughout the land.

It cannot therefore be denied, indeed, it has scarcely been
denied that this body, while composed of all the travelling
preachers, possessed the power to divide it and authorize the
organization and establishment of the two separate independent
churches.   The power must necessarily be regarded as inherent
in the General Conference.   As they might have constructed
two ecclesiastical organizations over the territory of the United
States originally, if deemed expedient, in the place of one, so
they might, at any subsequent period, the power remaining
unchanged.

But, it is insisted, that this power has been taken away or
given up, by the action of the General Conference of 1808.   In
that year the constitution of this body was changed so as to be
composed, thereafter, by travelling preachers, to be elected by the
annual conferences, in the ratio of one for every five members.
This has been altered from time to time, so that, in 1844, the
representation was one for every twenty-one members.   At the
time of this change, and as part of it, certain limitations were
imposed upon the powers of this General Conference, called the
six restrictive articles : — 1. That they should not alter or change
the articles of religion, or establish any new standard of doc-
trine.   2. Nor allow of more than one representative for every
fourteen members of the annual conferences, nor less than one
for every thirty.   3. Nor alter the government so as to do away
with episcopacy, or destroy the plan of itinerant superintend-
encies.   4. Nor change the rules of the united societies.   5.
Nor deprive the ministers or preachers of trial by a committee,
and of appeal : nor members before the society, or lay commit-
tee, and appeal.   And 6. Nor appropriate the proceeds of the
Book Concern, nor the charter-fund, to any purpose other than
for the benefit of the travelling, supernumerary, superannuated,
and worn out preachers, their wives, widows, and children.   Sub-
ject to these restrictions, the delegated conference possessed the
same powers as when composed of the entire body of preachers.

And it will be seen that these relate only to the doctrine of the church, its representation in the General Conference, the episcopacy, discipline of its preachers, and members, the Book Concern, and charter-fund.   In all other respects, and in every thing else that concerns the welfare of the church, the General Conference represents the sovereign power the same as before. This is the view taken by the General Conference itself, as exemplified by the usage and practice of that body.   In 1820 they set off to the British Conference of Wesleyan Methodists the several circuits and societies in Lower Canada.   And in 1828 they separated the Annual Conference of Upper Canada from their jurisdiction, and erected the same into a distinct and independent church.   These instances, together with the present division, in 1844, furnish evidence of the opinions of the eminent and experienced men of this church in these several conferences, of the power claimed, which, if the question was otherwise doubtful, should be regarded as decisive in favor of it.   We will add, that all the northern bishops, five in number, in council in July, 1845, acting under the plan of separation, regarded it as of binding obligation, and conformed their action accordingly.

It has also been urged on the part of the defendants that the division of the church, according to the plan of the separation, was made to depend not only upon the determination of the southern annual conferences, but also upon the consent of the annual conferences north, as well as south, to a change of the sixth restrictive article, and as this was refused, the division which took place was unauthorized.   But this is a misapprehension.   The change of this article was not made a condition of the division.   That depended alone upon the decision of the southern conferences.

The division of the Methodist Episcopal Church having thus taken place, in pursuance of the proper authority, it carried with it, as matter of law, a division of the common property belonging to the ecclesiastical organization, and especially of the property in this Book Concern, which belonged to the travelling preachers.   It would be strange if it could be otherwise, as it respects the Book Concern, inasmuch as the division of the association was effected under the authority of a body of preachers who were themselves the proprietors and founders of the fund.

It has been argued, however, that, according to the plan of separation, the division of the property in this Book Concern was made to depend upon the vote of the annual conferences to change the sixth restrictive article, and that whatever might be the legal effect of the division of the church upon the com-

mon property otherwise, this stipulation controls it and prevents a division till the consent is obtained.

We do not so understand the plan of separation. It admits the right of the church south to its share of the common property, in case of a separation, and provides for a partition of it among the two divisions, upon just and equitable principles; but, regarding the sixth restrictive article as a limitation upon the power of the General Conference, as it respected a division of the property in the Book Concern, provision is made to obtain a removal of it. The removal of this limitation is not a condition to the right of the church south to its share of the property, but is a step taken in order to enable the General Conference to complete the partition of the property.

We will simply add, that as a division of the common property followed, as matter of law, a division of the church organization, nothing short of an agreement or stipulation of the church south to give up their share of it, could preclude the assertion of their right; and, it is quite clear, no such agreement or stipulation is to be found in the plan of separation. The contrary intent is manifest from a perusal of it.

Without pursuing the case further, our conclusion is, that the complainants and those they represent, are entitled to their share of the property in this Book Concern. And the proper decree will be entered to carry this decision into effect.

The complainants represent, not only all the beneficiaries in the division of the church south, but also the General Conference and the annual conferences of the same. The share therefore of this Book Concern belonging to the beneficiaries in that church, and which its authorities are entitled to the safekeeping and charge of, for their benefit, may be properly paid over to the complainants as the authorized agents for this purpose.

We shall accordingly direct a decree to be entered reversing the decree of the court below, and remanding the proceedings to that court, directing a decree to be entered for the complainants against the defendants; and a reference of the case to a master to take an account of the property belonging to the Book Concern, and report to the court its cash value, and to ascertain the portion belonging to the complainants, which portion shall bear to the whole amount of the fund the proportion that the travelling preachers in the division of the church south bore to the travelling preachers in the church north, at the time of the division of said church. And on the coming in of the report, and confirmation of the same, a decree shall be entered in favor of the complainants for that amount.

## *Order.*

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the District of Ohio, and was argued by counsel. On consideration whereof it is ordered, adjudged, and decreed by this court, that the decree of said Circuit Court in this cause be, and the same is hereby, reversed and annulled. And this court doth further find, adjudge, and decree:

1. That, under the resolutions of the General Conference of the Methodist Episcopal Church, holden at the city of New York, according to the usage and discipline of said church, passed on the eighth day of June, in the year of our Lord one thousand eight hundred and forty-four, (in the pleadings mentioned,) it was, among other things, and in virtue of the power of the said General Conference, well agreed and determined by the Methodist Episcopal Church in the United States of America, as then existing, that, in case the annual conferences in the slaveholding States should find it necessary to unite in a distinct ecclesiastical connection, the ministers, local and travelling, of every grade and office, in the Methodist Episcopal Church, might attach themselves to such new ecclesiastical connection, without blame.

2. That the said annual conferences in the slaveholding States did find and determine that it was right, expedient, and necessary to erect the annual conferences last aforesaid into a distinct ecclesiastical connection, based upon the discipline of the Methodist Episcopal Church aforesaid, comprehending the doctrines and entire moral and ecclesiastical rules and regulations of the said discipline, (except only in so far as verbal alterations might be necessary to, or for a distinct organization,) which new ecclesiastical connection was to be known by the name and style of the Methodist Episcopal Church South; and that the Methodist Episcopal Church South was duly organized under said resolutions of the said General Conference, and the said decision of said annual conferences last aforesaid, in a convention thereof held at Louisville, in the State of Kentucky, in the month of May, in the year of our Lord one thousand eight hundred and forty-five.

3. That, by force of the said resolutions of June the eighth, eighteen hundred and forty-four, and of the authority and power of the said General Conference of the Methodist Episcopal Church as then existing, by which the same were adopted, and by virtue of the said finding and determination of the said annual conferences in the slaveholding States therein mentioned, and by virtue of the organization of such conferences into a

distinct ecclesiastical connection as last aforesaid : the religious association known as the Methodist Episcopal Church in the United States of America as then existing, was divided into two associations, or distinct Methodist Episcopal Churches, as in the bill of complaint is alleged.

4. That the property denominated the Methodist Book Concern at Cincinnati, in the pleadings mentioned, was, at the time of said division, and immediately before, a fund subject to the following use — that is to say, that the profits arising therefrom, after retaining a sufficient capital to carry on the business thereof, were to be regularly applied towards the support of the deficient travelling, supernumerary, superannuated, and worn out preachers of the Methodist Episcopal Church, their wives, widows, and children, according to the rules and discipline of said church; and that the said fund and property are held under the act of incorporation in the said answer mentioned, by the said defendants, Leroy Swormstedt and John H. Power, as agents of said Book Concern, and in trust for the purposes thereof.

5. That, in virtue of the said division of said Methodist Episcopal Church in the United States, the deficient, travelling, supernumerary, superannuated, and worn out preachers, their wives, widows, and children comprehended in, or in connection with, the Methodist Episcopal Church South, were, are, and continue to be beneficiaries of the said Book Concern to the same extent, and as fully as if the said division had not taken place, and in the same manner and degree as persons of the same description who are comprehended in, or in connection with, the other association, denominated since the division of the Methodist Episcopal Church; and that as well the principal as the profits of said Book Concern, since said division, should of right be administered and managed by the respective general and annual conferences of the said two associations and churches, under the separate organizations thereof, and according to the shares or proportions of the same as hereinafter mentioned, and in conformity with the rules and discipline of said respective associations, so as to carry out the purposes and trusts aforesaid.

6. That so much of the capital and property of said Book Concern at Cincinnati, wherever situate, and so much of the produce and profits thereof as may not have been heretofore accounted for to said church south, in the New York case hereinafter mentioned, or otherwise, shall be paid to said church south, according to the rate and proportions following, that is to say, in respect to the capital, such share or part, as corresponds with the proportion which the number of the travel-

ling preachers. in the annual conferences which formed themselves. into the Methodist Episcopal Church South, bore to the number of all the travelling preachers of the Methodist Episcopal Church before the division thereof, which numbers shall be fixed and ascertained as they are shown by the minutes of the several annual conferences next preceding the said division and new organization in the month of May, A. D. eighteen hundred and forty-five.

And in respect to the produce or profits, such share or part as the number of annual conferences which formed themselves into the Methodist Episcopal Church South bore, at the time of said division, in May, A. D. 1845, to the whole number of annual conferences then being in the Methodist Episcopal Church, excluding the Liberia Conference: so that the division or apportionment of said produce and profits shall be had by conferences, and not by numbers of the travelling preachers.

7. That said payment of capital and profits, according to the ratios of apportionment so declared, shall be made and paid to the said Smith, Parsons, and Green, as commissioners aforesaid, or their successors, on behalf of said church south and the beneficiaries therein, or to such other person or persons as may be thereto authorized by the General Conference of said church south, the same to be subsequently managed and administered so as to carry out the trusts and uses aforesaid, according to the discipline of said church south, and the regulations of the General Conference thereof.

8. And in order more fully to carry out the matters hereinbefore settled and adjudged, it is further ordered and decreed, that this cause be remanded to the said Circuit Court for further proceedings — that is to say,

That the same be referred to a master to take and state an account as follows:

(1.) Of the amount and value of the said Book Concern at Cincinnati, on the first day of May, 1845, and of what specific property and effects (according to a general description or classification thereof) the same then consisted, whether composed of real or personal estate, and of whatever nature or description the same may have been; and a similar account as of the date or time when the said master shall take this account.

(2.) Of the produce and profits of said Book Concern, from the time of the General Conference of May, 1844, as reported thereto, (if so reported,) up to the time of the said division in May, 1845, and from the last-mentioned date down to the time of making up his report: specifying how much of said profits and produce have been transferred to said Book Concern, at New York, and accounted for to said church south in the

settlement of the case there; and how much remains to be accounted for to said church south on the basis settled by this decree.

And in taking said. accounts, and in the execution of said reference, the said defendants shall produce, on oath, all deeds, accounts, books of account, instruments, reports, letters, and copies of letters, memoranda, documents, and writings, whatever pertinent to said reference, in their possession or control, and the said defendants may be examined, on oath, on the said reference; and each party may produce evidence before the master, and have process to compel the attendance of witnesses.

And the said master is further directed, in respect to any annual profits of said concern, not heretofore accounted for to said church south, to allow to said church south interest at the rate of 6 per cent. upon such unpaid balances from the date at which the same ought to have been paid.

And in respect to all the costs in this case, including the costs of the reference, and all other costs from the commencement of the case until its conclusion, and in respect to the fees of counsel and solicitors therein, of both parties, so far as the same may be reasonable, and in respect of just and necessary expenses, as well of plaintiffs as of defendants in conducting the suit, the same ought to be paid out of said Book Concern, and a common charge thereon, before apportionment and division, and the master is accordingly directed to allow and pay the same to the respective parties entitled thereto, and then to apportion the residue according to the principles fixed in this decree.

And the master is further directed to return his report to the said Circuit Court with all convenient despatch, which court shall then proceed to enforce the payment of whatever sum or sums may be found due to said church south, on the confirmation of the master's report, in such instalments as may be by said court adjudged reasonable, each party having due opportunity of excepting to the master's report; and all questions arising upon said report, and not settled by this decree, may be moved before said Circuit Court, to which court either party shall be at liberty to apply on the footing of this decree.