## SMITH et al. v. BOARD OF PENSIONS OF THE METHODIST CHURCH, INC., IN MISSOURI.

### Civil Action No. 936.

District Court, E. D. Missouri, E. D.

Feb. 15, 1944.

Harry C. Barker, of St. Louis, Mo., and George W. Reed, Jr., of Tulsa, Okl., for plaintiff.

Charles M. Hay and E. D. Franey, both of St. Louis, Mo., and Martin E. Lawson, of Liberty, for defendant.

HULEN, District Judge.

Plaintiff instituted this action as a class suit.

Defendant is a charitable corporation organized under the laws of Missouri by pro forma decree of the Circuit Court of the City of St. Louis. Its function is to hold, invest, administer and distribute the income of trust funds. The beneficiaries of the trust are superannuated ministers, their widows and orphans, of the Methodist Episcopal Church, South (now merged with The Methodist Church). Its officers also promote the raising of funds for the trust estate.

█ Plaintiff is now receiving a pension from the fund. Preceding the trial, as an entry of appearance of parties plaintiff, a list of 65 names was filed, as of the same class as plaintiff and having a like interest in the trust fund administered by the defendant.[1]

The early history of the Methodist Episcopal Church bears upon certain actions taken by the church at a later date. In 1784 some seventy ministers organized the Methodist Episcopal Church. Originally the legislative bodies of the church were composed exclusively of ministers with a minority contending for representation by laymen. This minority waged a losing campaign for their cause with the result that in 1828, at the General Conference, they left the church as a "reformer group" and organized the Methodist Protestant Church. As thus divided the Methodist Episcopal Church continued until 1844, when that section of the Methodist Episcopal Church located below the "Mason and Dixon's line" left the original church and formed the Methodist Episcopal Church, South. The three divisions of the Methodist Episcopal Church went their separate ways until May 10, 1939. At a Uniting Conference held in Kansas City on that date they re-united as "The Methodist Church". This, in brief, is the history of the beginning of the Methodist Episcopal Church in this country, its division and re-union. During the period of division the Articles of Religion of the respective branches remained the same. The Confession of Faith of the united church is the same as that of the three divisions prior to the Uniting Conference.

The defendant was originally incorporated in 1918, as "The Board of Finance of the Methodist Episcopal Church, South". Its Articles of Association were amended by decree of the Circuit Court of the City of St. Louis on February 13, 1940. The amendment included a change of name to "Board of Pensions of the Methodist Church, Incorporated in Missouri".

The gist of plaintiff's case is:

Early in its history the Methodist Episcopal Church, and since 1844 the Methodist Episcopal Church, South, has raised and administered funds for the benefit of superannuated ministers, their widows and orphans, of the Church. (By what agency this fund was administered prior to organization of defendant in 1918 does not appear.) As originally incorporated the object and purpose of the defendant was to provide support and maintenance for the superannuated ministers, their widows and orphans, of the Methodist Episcopal Church, South. Under the terms of its original charter defendant raised or received approximately Six Million Dollars, the income from which was to be distributed as indicated. Plaintiff was superan-

[1] In class action the citizenship of the original parties determines the jurisdiction in so far as it is controlled by diversity of citizenship. Stewart v. Dunham, 115 U.S. 61, 5 S.Ct. 1163, 29 L.Ed. 329, Hutchinson Box Board & Paper Co. v. Van Horn, 8 Cir., 299 F. 424.

nuated in 1937 by the Methodist Episcopal Church, South, and thereafter continued to draw a pension from the income of the fund through the defendant.

Plaintiff alleges in his complaint that by virtue of the act of union, whereby the Methodist Episcopal Church, South, united with the Methodist Episcopal Church and the Methodist Protestant Church under the name of "The Methodist Church", the Methodist Episcopal Church, South, passed out of existence; that at the time defendant amended its charter in February, 1940, it changed the class of beneficiaries under the trust administered by it from the superannuated preachers, their widows and orphans, of the Methodist Episcopal Church, South, to a like class, but of "The Methodist Church"; that the defendant was without power to make this change and that notwithstanding "its illegality" the defendant is controlling and managing the trust fund and distributing or "threatening to distribute" the income, not only to the beneficiaries as provided in its original Articles of Association, but is diverting the purpose of the trust in that it is either paying or threatening to pay the income to others; "towit: preachers that have been superannuated by the Annual Conferences of The Methodist Church and to the widows and orphans of the preachers now deceased, who were superannuated preachers of the Methodist Episcopal Church and the Methodist Protestant Church". Based on this hypothesis, coupled with membership in the Methodist Episcopal Church, South, prior to the act of Union, it is plaintiff's claim—

"* * * that unless said defendant is divested of the title to and control of said trust fund *and same be distributed to beneficiaries as they existed as of May 10, 1939, the date of the merger of said Churches,* said defendant will continue to illegally disburse the income from said fund and waste and dissipate the corpus of said trust estate to the irreparable loss of plaintiff and others of the same class."

Independent of the charge that the trust fund is being unlawfully diverted by a change or enlargement of the beneficiary class, it is alleged the defendant has mismanaged the trust by investing in common stocks; by purchasing securities without adequate collateral; by retaining doubtful securities; by speculative investments; that its investments are not of the character required by law for trust

funds; that the officers of defendant are inexperienced in financial affairs and incompetent to administer the trust funds; that the cost of administering the funds is grossly excessive, and other charges of a similar character.

The prayer of the complaint is: That the defendant be removed as trustee of the fund, a Receiver be appointed to liquidate the fund—"to the superannuated ministers, their widows and orphans, of the Methodist Episcopal Church, South, in being on May 10, 1939"; that a master be appointed to determine such beneficiaries; or in the alternative that a new trustee or receiver be appointed to administer the funds with payment to the "legal beneficiaries", towit: "superannuated ministers, their widows and orphans, of the Methodist Episcopal Church, South, who were in being on May 10, 1939"; for an audit; and attorneys fees.

At the conclusion of the opening statement of counsel for plaintiff, the following took place:

"The Court: In reading your pleadings, I got the impression that it was your claim that when the plan of union was adopted in May, 1939, there were three churches united under the name of Methodist Church, that you took the position that at that time your client's interest became fixed, and that he was entitled, along with others similarly situated, to a distribution of the fund. Do I correctly interpret the pleadings in that respect?

"Mr. Reed: Yes. Now, we raised the question for the consideration of the Court, but I am glad to state to Your Honor that we are not insisting on that. That was one possibility only that occurred to me in the preparation of the bill, that if the Court should determine, as a matter of law, that the former Methodist Episcopal Church South had ceased to exist, then there could be no added beneficiaries.

"The Court: Very well. Now let me get the matter clear in my mind. In view of your statement on that score, just what relief are you seeking from this Court?

"Mr. Reed: We are seeking, first, that the Court decree and declare invalid those purported amendments that operate, according to our contention, as a diversion of the trust fund.

"The Court: You mean the amendments by which the Board of Finance was reorganized and the charter amended?

"Mr. Reed: Yes.

"The Court: That is the only relief you seek?

"Mr. Reed: Yes. And we ask also that, by reason of this mismanagement, the careless way in which the funds have been invested and the income from them has been used, and a part of the corpus of the estate has been expended for purposes not covered by the trust or not authorized by the trust, that this fund be placed in the hands of some responsible, reputable trust company that will administer it carefully and will collect the proceeds and disburse them in accordance with the original purposes."

With this state of the record, two questions are presented for determination in this case:

First: The legality of the Charter amendments of 1939, of the defendant; and

Second: Has the defendant been guilty of mismanagement of the trust to justify its removal?

Decision on the first proposition requires an examination of the original and amended charter of the defendant, the proceedings leading up to the Uniting Conference and the Church discipline adopted by the Uniting Conference, this to determine whether or not the amendments to the Charter of the defendant were in accordance with the directions of those bodies and who had the right to control the defendant.

Consideration of this issue is simplified by the lack of dispute in the testimony. The Articles of Religion or Confession of Faith of the three divisions of the Methodist Episcopal Church remained the same as originally embraced by that body and was not changed by the Uniting Conference of 1939. Prior to the Uniting Conference the only religious difference between plaintiff and superannuated ministers of the other two branches of the Methodist Episcopal Church, was one in name only and the geographical field in which they worked. With the Uniting Conference those differences disappeared. Plaintiff and his brothers of the other two branches of the church preached the same gospel, had the same creed, whether north or south of the "Mason and Dixon's line".

The legality of the acts by which the three branches of the Methodist Episcopal Church united is not challenged in any detail; yet there are certain of those proceedings complained of by plaintiff, that bear upon the legality of the amendments to the charter of the defendant.

The government of The Methodist Church is now, and prior to Union, each of the divisions, was vested in one body of the church called the General Conference, and in certain subordinate bodies called Annual Conferences, and in bishops, traveling ministers and preachers. The General Conference is and was supreme.

Preceding the Uniting Conference in 1939 a plan of union was prepared and presented to the three branches of the Methodist Episcopal Church, as it then existed. The plan of union was voted upon at each of the Annual Conferences of the Methodist Episcopal Church, South, during the year 1937 and was recommended by three-fourths or more of the members of the said Annual Conferences. In April, 1938, the General Conference of the Methodist Episcopal Church, South, adopted the plan of union for uniting the three divisions of The Methodist Episcopal Church. The plan of union provided:

"Article I.—There shall be a Uniting Conference composed of 900 Delegates, of whom 400 shall be from The Methodist Episcopal Church, 400 from The Methodist Episcopal Church, South, and 100 from the Methodist Protestant Church, chosen in such manner as may be determined by the respective General Conferences, provided that the Ministerial and Lay Members shall be in equal numbers.

\* \* \* \* \* \*

"Article IV.—The duties and powers of the Uniting Conference, subject to the provisions of this Plan of Union, shall be:

\* \* \* \* \* \*

"5. To provide a plan for the control and safeguarding of *all permanent funds* and other property interests of the three Churches and the interests of those persons and causes for which these funds were established.

"Article V.—In order to facilitate the work of the Uniting Conference, the three General Conferences at the sessions wherein this Plan of Union is approved shall continue their Commissions on Union with such changes in personnel as they may desire, and authorize the Joint Commission thus formed to make special preparation for the Uniting Conference by the appointment of proper committees to deal with

(a) membership, conferences, ministry, judicial administration, and temporal economy; (b) rituals; (c) connectional boards and societies; (d) publishing interests; (3) permanent and *pension funds;* and (f) such other matters as imperatively call for advance consideration." (Emphasis added.)

During the Uniting Conference held on May 1, 1939, Report No. 1 of the Committee on Superannuate Support was adopted. Paragraphs 1 and 2 of the Committee Report read as follows:

"Par. 1301. 1. There shall be a Board of Pensions of The Methodist Church having the administration of the support of Conference Claimants of The Methodist Church in succession to 'The Board of Pensions and Relief of the Methodist Episcopal Church,' which is incorporated under the laws of the State of Illinois in that name, *and in succession to 'The Board of Finance of the Methodist Episcopal Church, South', which is incorporated under the laws of the State of Missouri in that name,* and in succession to the Board of Managers of 'The General Fund for Superannuates of the Methodist Protestant Church', which is incorporated under the laws of the State of Maryland in that name. *The three Corporations aforesaid* are referred to hereinafter, respectively, as the Illinois Corporation, *the Missouri Corporation,* and the Maryland Corporation. *These three Corporations shall be continued with their headquarters* in Chicago, Illinois; *St. Louis, Missouri;* and Baltimore, Maryland, respectively, *but with their corporate names changed to, and to be known as* 'The Board of Pensions of The Methodist Church, Incorporated in Illinois', and *'The Board of Pensions of The Methodist Church, Incorporated in Missouri',* and 'The Board of Pensions of The Methodist Church, Incorporated in Maryland', respectively.

"2. The Illinois Corporation shall be responsible for the administration of funds for the support of Conference Claimants in the Northeastern, the North Central, the Western, and the Central Jurisdictional Conferences, *and the Missouri Corporation shall be responsible for the administration of funds for the support of Conference Claimants in the Southeastern and the South Central Jurisdictional Conferences."* (Emphasis added.)

On May 2, 1939, Report No. 2 of the Committee on Superannuate Support was adopted by the Uniting Conference. Pertinent parts of that report read as follows:

"Par. 1309. *Until the General Conference shall order otherwise, the income from the Endowment Fund for Superannuates held by the Missouri Corporation shall be distributable as annuities on account of service of Conference Claimants formerly rendered in an Annual Conference of the Methodist Episcopal Church, South, or service rendered in an Annual Conference of The Methodist Church within the territory of the Missouri Corporation;* provided, however, that in case of any Annual Conference formerly of the Methodist Episcopal Church which shall remain substantially unaffected in its liability for annuities by Unification, in order to participate in the distribution made by the Missouri Corporation, it shall be necessary for such Conference to deposit with the Missouri Corporation assets sufficient to produce an annual income equivalent to the amount which would be distributed to such Conference in the event it elects to participate." (Emphasis added.)

Acting under the direction contained in Committee Reports 1 and 2, adopted by the Uniting Conference, the defendant presented an amended charter to the Circuit Court of the City of St. Louis. On February 13, 1940, that court entered an order amending the Articles of Incorporation of the defendant. Article 7 of the amended charter of the defendant corporation reads as follows:

· "Article VII—Distribution of Funds— All funds raised as herein provided and available for appropriation and distribution by this Association shall be distributed to superannuated, worn-out or permanently disabled preachers, their widows, and orphans, of The Methodist Church, or others, *according to the rules and regulations provided or enacted, from time to time, by the General Conference of The Methodist Church,* or as may be provided by the By-Laws of this Association." (Emphasis added.)

Paragraph 1339 of the Discipline of the Methodist Church, adopted in 1940, contains the following sub-paragraph:

"2. The funds available for appropriation annually by the Missouri Corporation shall be · distributed to the Conference Claimants of The Methodist Church *within the territory administered by said Board as follows:* (a) To the Retired Ministers,

on the basis of years of service; (b) To the widows of deceased Ministers, on the basis of number of years that they have been the wives of effective Traveling Preachers; and the amount shall be seventy per cent of that paid to the Retired Ministers for a like number of effective years of service." (Emphasis added.)

At the General Conference of The Methodist Church held in 1940, the acts of the Uniting Conference were "ratified, approved and confirmed".

Reviewing the proceedings by virtue of which the three divisions of the Methodist Episcopal Church united, we find that the Methodist Episcopal Church, South, approved the plan of union and that in the plan approved it was expressly provided that the Uniting Conference should have the power, and one of its duties would be, to provide a plan for controlling and safeguarding and dealing with the permanent and pension funds of the Methodist Episcopal Church, South; then followed the adoption of Committee Reports by the Uniting Conference, whereby it was provided (Report No. 1) that there should be a Board of Pensions of The Methodist Church having the administration of the support of Conference Claimants of The Methodist Church in succession to the Board of Pensions of the Methodist Episcopal Church, South; that the original corporation should be continued with its headquarters in St. Louis, Missouri, but with the name changed to the Board of Pensions of The Methodist Church, Incorporated in Missouri. The corporation handling pension funds for the other two branches of the Methodist Church were also to continue as the "Illinois" corporation and the "Maryland" corporation. The report containing the above authority provided that the defendant would be responsible for the administration of funds for the support of Conference Claimants in the Southeastern and the South Central Jurisdictional Conferences. Jurisdictions were assigned to the "Illinois" and "Maryland" Corporations. There are approximately 34 conferences in the jurisdiction assigned to the defendant, and the approximate difference between the territory formerly represented by the Methodist Episcopal Church, South, and the jurisdiction thus assigned to the defendant is as follows: Kansas and Nebraska have been added to the jurisdiction. California, Oregon, Colorado, West Virginia, part of Maryland and part of Southern Illinois have been taken from the juris-

diction. Action of the Uniting Conference provided that the income from the Endowment Fund for Superannuates held by the defendant should be distributed as annuities on account of service of Conference Claimants formerly rendered in an Annual Conference of the Methodist Episcopal Church, South, or services rendered in an annual conference in a Methodist Church within the territory of the corporation. The defendant amended its Articles of Association to provide (Article 7) that the funds available for appropriation and distribution by the defendant should be distributed to superannuated, worn-out or permanently disabled preachers, their widows, and orphans, of The Methodist Church, *according to the rules and regulations, provided or enacted, from time to time, by the General Conference of The Methodist Church*". After these proceedings had taken place The Methodist Church, at its general conference in 1940, ratified and approved them.

Plaintiff's complaint declares that title to the funds constituting the trust now held by the defendant was never vested in the Methodist Episcopal Church, South, and therefore neither that church nor The Methodist Church, subsequent to the Uniting Conference, had any power to control the trust fund, but that—"On the contrary title to said fund * * * was vested in said Board of Finance (refers to original name of defendant) for the uses and purposes set forth in the original Articles of Association of the defendant, and that the beneficial interest and real ownership of the funds was vested in the plaintiff and other superannuated preachers and beneficiaries, as provided in the original Articles of Association of the defendant".

At the time the defendant was originally incorporated by pro forma decree of the Circuit Court of the City of St. Louis, such action was taken pursuant to the adoption at the 1918 General Conference of the Methodist Episcopal Church, South, of a "Constitution" for the defendant corporation. Articles 1 and 2 of the Constitution read as follows:

"Article I. There shall be a Board of Finance, consisting of a President, Vice-President, Secretary, Treasurer, and twenty-one Managers, composed of three bishops, nine traveling preachers, and nine lay members, *to be elected quadrennially by the General Conference* on nomination of the Committee on Conference Claimants, excepting the Secretary, who shall be

elected by ballot as are the other connectional officers; and to continue in office until their successors are elected and accepted. The Board shall fill all vacancies that may occur during the intervals of the General Conference. It shall be the duty of the Board to require good and sufficient bond of all officers responsible for its funds.

"Article II. This Board shall be incorporated and organized under the name and style of 'The Board of Finance of the Methodist Episcopal Church, South', under the laws of the State of Missouri, with its principal office at St. Louis, *and be subject to such amendments to its charter as may from time to time be adopted under the sanction of the General Conference of the Methodist Episcopal Church, South; subject, however, to such rules and regulations as may be prescribed by the General Conference* not contrary to said charter nor in excess of the powers that may be thereunder lawfully exercised, *and to be subject to the rules and regulations, usages and discipline of the Methodist Episcopal Church, South, now existing or hereafter to be created.*" (Emphasis added.)

The foregoing part of the "Constitution" afterwards became Articles 1 and 2 of the Articles of Association of defendant, and were filed with the petition for a pro forma decree of incorporation and were approved by the Court. Other provisions of the original Articles of Association of the defendant provided that the charter was subject to amendment by modification—"whenever such amendment or modification may be deemed necessary by the members thereof, or by the *General Conference of the Methodist Episcopal Church, South*". Distribution of funds according to the original Articles of Incorporation is covered by Article 7, and reads as follows:

"Article VII—Distribution of Funds— All funds raised as herein provided and available for appropriation and distribution of this Association shall be distributed to superannuated, worn-out or permanently disabled preachers, their widows and orphans, of the Methodist Episcopal Church, South, who otherwise would have no sufficient means for their support and maintenance, *according to the rules and regulations as may be provided or enacted from time to time by the General Conference of the Methodist Episcopal Church, South*". (Emphasis added.)

See also Article X of such original Articles of Incorporation:

"Article X. Dissolution. In the event this Association shall, for any reason, at any time, be dissolved, then all of its funds, properties and other assets, of any nature or kind whatsoever, shall be duly transferred by the President hereof at the time of such dissolution to such persons, firm, corporation or trustees, who may be duly appointed by the General Conference of the Methodist Episcopal Church, South, as the successor of this Association; such transfer and dissolution to be made in accordance with the laws of the State of Missouri."

Upon this record we hold that control of the defendant corporation passed to The Methodist Church by virtue of the action of the Methodist Episcopal Church, South, preceding the Uniting Conference; that the amendments to the charter of defendant complained of were in accord with the directions of the General and Uniting Conferences of The Methodist Church. Were the amendments to the charter of defendant so made, legal and binding on plaintiff and his class associates?

1. The Articles of Association of the defendant corporation placed final control and management of the defendant in the General Conference of the Methodist Episcopal Church, South. Its charter was subject to amendment according to rules and regulations, as provided from time to time by the General Conference of the Methodist Episcopal Church, South. See also, Secs. 5440–5443–5446, R.S.Mo.1939, Mo.R.S.A. By action of the Annual and General Conferences of the Methodist Episcopal Church, South, the legality of which is not questioned, power was delegated to the Uniting Conference, at which it was represented in a manner previously approved, to control the defendant and direct the disposition of pensions.

The Methodist Episcopal Church, South, ceased to function in name on and after the Uniting Conference in 1939, but does function and continue as a part of the now united, The Methodist Church, and through that body continues to administer its pension funds. In the case of Hayes et al. v. Manning, 263 Mo. 1, 172 S.W. 897, the Supreme Court of Missouri passed directly upon this question in the case of a union within the Presbyterian church, and on the subject of effect of union causing loss of identity stated (172 S.W. loc. cit. 906):

"The identity of the Cumberland Church, save as to the word 'Cumberland,' is not

lost. Its synods, presbyteries, church, sessions and particular churches remain the same as before the union, except that they are now acting conjointly with the United Church. Its Confession of Faith has been held by its highest judicatory, which holding has been approved by the presbyteries, to be the same as that of the United Church. Can it, therefore, be reasonably contended that the elimination of the word 'Cumberland,' and the substitution in lieu thereof the words 'Presbyterian Church U.S.A.,' destroys the identity of the former, and renders the latter a different and a distinct organization? There is nothing to support the contention that the property was purchased under a specific trust that it be retained for the use of the church under any particular name or while the exact creed as defined in the articles and constitution of the Cumberland Church was being taught. On the contrary, property deeded, devised, or donated under the facts appearing here, whether for the use of a particular church or for the entire church, is not impressed with a specific trust and its power to unite with another church of like faith and order carries with it, if need be, the power to eliminate its name and substitute another therefor, especially when it adheres to the generic term 'Presbyterian,' under which we designate the followers of the Calvinistic faith in this country. Pleasant Grove Congregation v. Riley, 248 Ill. 604, 94 N.E. 30; [Permanent] Committee of Missions v. Pacific Synod, 157 Cal. 105, 106 P. 395."

Based upon the decision of the Hayes case, the same Court ruled in like manner upon a similar question in the case of First Presbyterian Church of Louisiana v. Lynott, 78 S.W.2d 396. There the question was before the Court on the pleadings (78 S.W.2d loc. cit. 403):

"Briefly summarized, the petition alleges that, *by and through the union and reunion of the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America and the subsequent and resulting effective union and reunion of the Louisiana Congregation of the Cumberland Presbyterian Church and the congregation of the First Presbyterian Church of Louisiana, the said Louisiana Cumberland Presbyterian Church was perpetuated and continued, under the name and in, through, and as a part of the First Presbyterian Church of Louisiana.* * * *

"When the allegations of the petition in reference to the identity and rights of the plaintiff are considered in the light of the decision of this court (en banc) in Hayes v. Manning, 263 Mo. 1, 172 S.W. 897, the decisions of our federal courts and numerous state courts of last resort, some of which are listed below, we are of the opinion the petition sufficiently pleads right and title in plaintiffs under the provisions of the sixth paragraph of the will." (Emphasis added.)

Finally we direct attention to the case of Smith et al. v. Swormstedt, 16 How. 288, 14 L.Ed. 942, where the Court passed on the effect on property owned jointly by the Methodist Episcopal Church resulting from 1844 division. We quote a condensed summary in the syllabus:

"The Methodist Church was divided. It was not a case of the secession of a part from the main body. Neither division lost its interest in the common property.

"The General Conference of 1844, had the legitimate power thus to divide the church. In 1808 the General Conference was made a representative body, with six restrictive articles upon its powers. But none of these articles deprived it of the power of dividing the church.

"The sixth restrictive article provided that the General Conference should not appropriate the profits of the Book Concern to any other purpose than for the benefit of the traveling ministers, their widows, &c.; and one of the resolutions of 1844 recommended to all the annual conferences to authorize a change in the sixth restrictive article. This was not imposed as a condition of separation, but merely a plan to enable the General Conference itself to carry out its purposes.

"The separation of the church into two parts being legally accomplished, a division of the joint property by a court of equity follows, as a matter of course."

If property of the Church is to be divided between dividing branches of the Church *and not individuals,* on a separation, by what reasoning can it be claimed that *individuals* should receive the property on re-uniting of the branches of the Church?

If the directions of the General Conference of The Methodist Church and the amended Articles of Association of defendant are followed, payment of pensions from the trust fund will be little different from the class that received annuities from the defendant under the original Articles of Association of defendant. Two states have been added to the jurisdiction of the de-

fendant. Four states and parts of two more have been taken from it. That those entitled to pension benefits in the territory taken from defendant have been added to the charge of either the "Illinois Corporation" or the "Maryland Corporation" (see paragraph 1 of Report No. 1 of Committee on Superannuate Support) appears evident from lack of their presence in this cause. They are not objecting to the changes made so far as this record indicates.

Reviewing the proceedings of the General Conference of The Methodist Church and the recognition of the origin of the trust fund by that body, there is apparent a desire to keep, for the time being at least, beneficiaries of the fund in the same group, or as near the same group as practical, as was the situation prior to the time the three divisions of the Methodist Episcopal Church united.

That a plan could have been formulated and executed that would more exactly confine the beneficiaries of the funds administered by the defendant to those who would have received the income, had there been no Uniting Conference, may have been a possibility but such a plan that has sufficient merit in it to justify overriding the decision of the Church, has not been suggested to the Court. This Court is in no position to order a more equitable plan to carry out the intention of the donors of this fund from the record before it.

We are not concerned with a trust fund fixed in nature as to future beneficiaries. Under the organization of defendant and the express provisions of its Charter, it was subject to the will of its creator, the Methodist Episcopal Church, South. That Church had the power to determine plaintiff's rights to a pension. It had the right to change the test to determine one's right to a pension. These rights of the Methodist Episcopal Church, South went with it when it joined and became part of The Methodist Church. It is exercising these rights as a part of the United organization. The beneficiary list of a trust of the nature administered by the defendant should not and can not be a fixed body.

In a charitable trust of this character the beneficiaries are constantly changing. It constitutes some inducement to those who contemplate a life of service to the Church, that they may look to this fund for support when the day of their active service is passed. The rate of pensions must fluctuate, as pensioners are added or taken from its rolls; as the funds increase; as the income increases or decreases. These things of themselves establish not only that the fund is church property held in trust, but that no person can have a fixed interst in the fund or its income.

"Accordingly in the analysis and classification of virtues, a trio is made, thus: And now abideth faith, hope and charity, these three; but the greatest of these is charity. Agreeable thereto, as said heretofore, the law favors and nourishes charity. The beneficiaries of it may be somewhat uncertain, the grant a little indefinite, but the law benignly aids the charitable use by recognizing that in a public charity uncertainty as to the individual whom the benefit may reach is one of its essential features. Hadley v. Forsee, supra, 203 Mo. [418], loc. cit. 427, 101 S.W. 59, 14 L.R.A.,N.S., 49; Chambers v. St. Louis, 29 Mo. [543], loc. cit. 590." Mott v. Morris, 249 Mo. 137, 155 S.W. 434, loc. cit. 438.

This Court can find no basis for the plaintiff's contention that the title of the pension fund was vested in defendant, in trust "only for the uses and purposes set out" *in the original articles of association,* and that "the beneficial interest and real ownership of the fund was vested (at all times) in the plaintiff and other beneficiaries designated and determined by the provisions" of the original Articles of Association of the defendant, and that the Articles of Association were in this respect not subject to change. The defendant was created by the Methodist Episcopal Church, South, subject to its control and direction, and since that organization joined with The Methodist Church at the time of the Uniting Conference, it continues to be a creature of and subject to the directions and control of its creating body acting through "The Methodist Church".

On this point the decision of the Supreme Court of Missouri states an applicable rule of law in the case of State ex rel. Pittman v. Adams et al., 44 Mo. 570, loc. cit. 580:

"On the one hand, if this power of change be denied, the objects of a charity, it may be said, might become obsolete, or its legitimate ends be crippled by inconvenient provisions that would embarass its operations, and this limitation of power might destroy, instead of carrying into effect, the will of the founder. But it is not necessary to hold all changes to be

absolutely prohibited; *for it is easy to imagine such altered conditions of society and of pursuits that a strict adherence to all the formal requirements of a foundation might defeat its object,* as, for instance, if in centuries past the founder of a college had enumerated alchemy and astrology among its studies, the study of chemistry and astronomy might be deemed a truer compliance with the object of the charity; for it should be presumed that he desired the pursuit of the *substance rather than the shadow,* even though he had been able to see only the shadow. *So other changes may be found necessary in furtherance of the objects of the charity, which visitors should have authority to make or assent to, if they require an amendment to the charter."* (Emphasis added.)

No one has asserted in this trial that the uniting of the three branches of The Methodist Church was not a beneficial thing for the Church. Certainly this Court is not authorized in taking a contrary view in the absence of evidence on the subject.

"It matters not, therefore, except as to the extent of its efforts for the emancipation of the individual, whether its churches be divided or united. Divided, each in its own sphere will work out its destiny; united, it will present a solid phalanx against all forms of oppression." Hayes v. Manning, 263 Mo. 1, 172 S.W. 897, loc. cit. 908.

So we ask, since the act of uniting has no semblance of wrong, legal or otherwise, what arrangements could have been made under the circumstances surrounding the Uniting Conference that would have been more just and equitable in protecting and safeguarding the pension funds of some Six Million Dollars that had been raised through the Methodist Episcopal Church, South? What could have been done to more faithfully effect and carry out and perpetrate the purposes for which the funds were raised? Plaintiff has made two suggestions in the nature of demands. One, as contained in the complaint, that the fund of approximately Six Million Dollars should be divided "and same distributed to beneficiaries as they existed as of May 10, 1939, the date of the merger of said churches". The statement of such a suggestion carries with it its answer. When presented with this claim as set out in the complaint, at the commencement of the trial of this law suit, plaintiff's counsel stated:

"* * * I am glad to state to your Honor, that we are not insisting on that".

Second, that:

"The Court appoint a trustee * * * to administer the trust fund * * * and distribute the income therefrom to the rightful beneficiaries, the superannuated ministers, their widows and orphans, of the Methodist Episcopal Church, South, *who were in being on May 10, 1939."*

There is evidence that on May 10, 1939 (the date of the Uniting Conference), there were approximately 3500 beneficiaries receiving annuities from the defendant, Plaintiff claims that the rights of these beneficiaries became fixed on that date; that since the Methodist Episcopal Church, South, went "out of existence" on that date, only the beneficiaries in existence at that time have any right to the income from the fund. Let us follow this position to its logical conclusion. As time goes by the number of beneficiaries must become smaller, as death is no respecter of persons. As the group thus becomes smaller the proportionate share of the living in the income must become larger, and as death shall reduce the number until finally there is only one remaining, this one will be receiving the entire income from the trust. This fantastic proposal would leave the corpus of the trust fund an orphan on the day when the last pensioner passes on. If the beneficiaries of the income of the trust were fixed on May 10, 1939, by the same process the beneficiaries of the corpus of the trust were fixed.

If plaintiff's contentions were sustained their ultimate result would amount in effect to a forfeiture of the trust.

"Whatever the powers of a court of chancery to regulate or preserve in some form a charitable use, the terror of forfeiture is not one of them, except under the guarded limitations that there is no escape from that construction." [2]

Financially fortunate indeed would be the plaintiff, along with others similarly situated, that because they *perchance* were on the pension rolls of the Methodist Episcopal Church, South, on May 10, 1939, they are thereby entitled to share in the distribution of a Six Million Dollar trust fund or that the pension rolls were on that date closed to additional pensioners. With slight transposition—"pensioners" for "heirs" and "trust fund" for "church building"—we

---

[2] Mott v. Morris, 249 Mo. 137, 155 S.W. 484, loc. cit. 437.

believe a comment of the court in the Mott case applicable:

"What natural equity could there be in the proposition, that (absent an express provision of forfeiture in the grant itself, as here) those subscriptions, now in the form of the church building, only sprang as mist from here and there to finally descend in consolidated form as a bountiful and fruitful shower of rain upon the estate of this heir to enhance it? And all because the trustees have taken or in the future might take an erroneous view of their powers? Equity is not so lame and halting that it can afford no relief but forfeiture."

Contrast the plan for the future for the trust as proposed by the plaintiff with what has been done. The plan, as evidenced by the decisions of the Uniting and General Conferences and change in defendant's articles of association, appears to be equitable, fair and just. Were such not the case we have little doubt that plaintiff would find himself without the support of part at least of the 34 Annual Conferences located in the jurisdiction of the defendant. Be it noted that while plaintiff is in this Court seeking to destroy the perpetuation of the trust fund administered by the defendant, The East Oklahoma Conference, to which plaintiff belongs, has already turned over and long after this case was filed, expressed its intention of turning over additional funds to the defendant for investment and distribution of income. See Defendant's Exhibit 11, action of Board of Conference Claimants of the East Oklahoma Conference of The Methodist Church, October 19, 1943.

Plaintiff has not seen fit to use the remedies within the Church for redress of the grievances of which he complains. Under Article VII, Division III of the Plan of Union, and known as paragraph 40, Discipline of the Methodist Church, it is provided that the plaintiff could have made a request, in writing, to the Bishop presiding at an Annual Conference for decision on the question of law presented in his complaint and if dissatisfied with the Bishop's decision could have requested an appeal from that decision to the Judicial Council and by one-fifth of the Annual Conference present and voting, plaintiff could have presented his grievances to the Bishops at the Annual Conference of The Methodist Church, within the territory where defendant is located, and requested those Bishops, or a majority thereof, to request the Judicial Council to hear and determine the legality of the acts of the defendant, as complained of in the complaint.

We do not hold that this Court is without power to intervene in this case and make disposition of the trust property, if there was a plain diversion of it from the original trust purposes. There are cases holding that the Court may investigate the facts bearing upon the issue as to property rights where charges are made, such as found in the complaint in this case. Those cases hold that litigants are not relegated solely to ecclesiastical tribunals in such circumstances. The Supreme Court of Missouri said in the case of Boyles v. Roberts, 222 Mo. 613, 121 S.W. 805, loc. cit. 811:

"An analysis of our cases show that, in cases where civil or property rights are involved, the courts of this state will inquire into matters ecclesiastical. In the Watson case, supra [Watson v. Garvin, 54 Mo. 353], we held an act of the General Assembly of the Presbyterian Church, U. S. A., to be invalid and void, and to do so reviewed the constitution of the church, seeking for the alleged authority claimed by the General Assembly. So that this court has authorized an investigation of the fundamental laws of the church to determine whether or not its acts were valid thereunder. In the Russie case, supra, for the purpose of determining whether or not property had been diverted from a trust, we compared the two Confessions of Faith, to see whether or not they differed in doctrine. Thus it appears that, under our holdings, we will for ourselves examine such instruments for that purpose."

There is however a limitation, beyond which the Courts do not go in substituting their judgment for that of the Church Tribunals, in passing upon questions peculiar to the Church and only incidental to property interest of the individual.

Under the record in this case, we hold the action taken by the Methodist Episcopal Church, South, preceding the Uniting Conference, and decisions made by the Uniting Conference, constitute no such diversion of the trust fund as would authorize this court to substitute its judgment for that of the church in the selection of a trustee to administer the fund, to say nothing of distribution of trust property in accordance with the claim of plaintiff. Neither do we think that there has been such a change of identity of the Methodist Episcopal Church, South, as to

authorize such action. For this court to intercede and take the drastic action called for by plaintiff, or to remove the defendant from the administration of this trust and by such removal divorce the management and control of the trust from The Methodist Church there must be a real and substantial departure from the purpose of the trust. See Russie v. Brazzell, 128 Mo. 93, 30 S.W. 526, loc. cit. 532, 49 Am.St.Rep. 542:

"There must be a real and substantial departure from the purposes of the trust, —such an one as amounts to a perversion of it,—to authorize the exercise of equitable jurisdiction in granting relief. Happy v. Morton, 33 Ill. 398. It therefore follows that though there be a change in church polity, or alteration in the expressed form of faith, if the substantive theological doctrine and the general polity be retained, there is no such departure as would amount to a misuse or perversion of the trust. In this case, not only the denominational name, but the cardinal doctrines of faith, the general usages, and distinctive principles of the church, were preserved."

There is no evidence that either of the plaintiffs or anyone else made complaint that the purposes of the trust were being changed, during the proceedings leading up to and during the Uniting Conference.

"A departure which was not noticed by any of the congregation could not have been a very serious one. The language used by Mr. Russell is highly figurative, but it is susceptible of an interpretation consistent with the faith of the society; and it would be manifestly unjust to construe it as meaning something different from what his congregation understood it to mean when it was used." Happy v. Morton, 33 Ill. 398, loc. cit. 414. (Emphasis added.)

In this case we are not called upon to compare religious creeds, Confession of Faith or Church Discipline. Identity of faith and doctrine of the Methodist Episcopal Church, South, and The Methodist Church, subsequent to the Uniting Conference, is conceded by all parties to this case. The only change effected was the uniting of the three divisions of the Methodist Episcopal Church as one body. The right was vested in the Methodist Episcopal Church, South—and now in the defendant—to control the trust and disposition of the income by determining who are eligible thereto. This, considered with the lack of evidence that plaintiff and his class associates have suffered any financial loss from the changes made in defendant's Articles of Association, and alterations in the boundary of defendant's jurisdiction, leads us to hold that property rights are only incidentally involved in the amendment to defendant's Articles of Association, about which plaintiff complains. We believe these are matters that should be governed by the discipline of the Church. Such a ruling would seem to be supported by the weight of authority. See Hayes v. Manning, supra (Approved in First Presbyterian Church of Louisiana v. Lynott, Mo.Sup., 78 S.W.2d 396).

"The question as to the extent to which civil courts will interfere in the affairs of a church, where property rights are involved, has been considered and determined by many courts of last resort in our different states and by a number of subordinate tribunals. The rulings have not been wholly uniform, but the pronounced trend of authority is that, if a church, as an organization, has created a tribunal, or, as termed in the Presbyterian government, a 'judicatory,' having jurisdiction to determine differences between its members as to creed, doctrine, or discipline, the civil courts will not attempt to review or revise the judgments therein rendered. The lack of uniformity in the rulings of the civil courts consists in the fact that in some the decisions of the church courts are held to be persuasive, and are followed by the civil courts, except when they are held clearly to be wrong, while in others, if the matter in controversy relates to creed, doctrine, or discipline, the judgment of the church court is held to be conclusive upon the civil courts, although property rights may be incidentally involved. The Supreme Court of the United States, two United States Circuit Courts of Appeals, one United States District Court, the Supreme Courts of eleven of the states, and two state Courts of Appeals have held that the civil courts will not interfere with the judgment and decree of the highest judicatories of churches in regard to church government or dogma, although property rights may be incidentally involved. The Supreme Court of two states have held to the contrary. So much for the current of authority. The reasons adduced we have discussed elsewhere." (Emphasis added.) 172 S.W. loc. cit. 904.

The principle thus stated is as old as Christianity itself. The following illustration cannot be a stranger to the brethren

of the plaintiff. When Paul was brought before Gallio, Deputy or Governor of Achai, and a question of his violation of the laws of the Jews arose, the record (Acts 18 verses 14 and 16) reads:

"14. And when Paul was now about to open his mouth, Gallio said unto the Jews, If it were a matter of wrong or wicked lewdness, O ye Jews, reason would that I should bear with you;

"15. But if it be a question of words and names, and of your law, look ye to it; for I will be no judge of such matters."

The Supreme Court of the United States, in the case of Watson v. Jones, 13 Wall. 679, 729, 20 L.Ed. 666, said:

"It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."

■ By brief filed, plaintiff asserts that he and other pensioners of the Methodist Episcopal Church, South, who were receiving an income from the trust at the time of union have, not only a "fixed, vested, property interest" in the fund, as "fixed" by the original articles of agreement of defendant, but that such "vested rights could not be affected or diverted in whole or part" without the consent of plaintiff and other pensioners. We search the pages of the original articles of association of the defendant in vain for any language from which it could be concluded that—"a fixed, vested, property interest" was created in any pensioner. It is evident that the creators of this trust retained control of this trust at all times. They determined who should be admitted to the pension rolls and could have removed pensioners from the rolls. Furthermore, we have been cited to no case where the management of a trust of this character was by law or implication relegated to the will of those enjoying its benefits. Those cases cited by plaintiff, where property in the nature of Church edifices are held in the name of trustees for the benefit of the congregation, are not in point.

■ Plaintiff further alleges that by virtue of the changes made in the articles of agreement of the defendant, "twelve hundred or more" preachers are about to be added to the list of beneficiaries of the trust. The evidence does not sustain this claim, but if such were the case, are not such preachers so added of the same faith of plaintiff? Did they not perform the same identical character of service to the Church as plaintiff? Did they not teach exactly the same gospel? Did they not preach in the same land, save and except in a different locality? In so far as this record shows, just as many prospective pensioners may have been taken from the jurisdiction of the defendant and added to one of the other two "corporations", as have been made subject to be added.

■ Plaintiff further claims funds were used from the income of the trust to promote the "Special Effort", by which several million dollars was added to the trust fund. This took place long before the Uniting Conference, and at a time when plaintiff was not a pensioner. Neither plaintiff nor any other pensioner suffered by this action but on the contrary is now drawing considerably more as a pension than he would have but for such activity. If the expense for this "Special Effort" was not obtained from the source complained of, who then would have supplied the funds? We are bound to observe, at least in this instance, that as a pensioner plaintiff is hard to please. But plaintiff says that, "this promotion business" should be segregated from the administration of the trust. That we answer, is a complaint to be submitted to and decided by the governing body of The Methodist Church.

Plaintiff further argues from the assumed promise, i. e., "The terms of this non-religious vested trust, and it cannot be a religious trust * * * This is just a common, ordinary, every-day trust". The fund administered by the defendant is a public charitable trust and governed by those authorities peculiar to charitable trusts created and administered by religious bodies. Plaintiff apparently recognizes this to be a fact since a portion of his brief is made up of such cases.[3] We have read plaintiff's brief and examined the authori-

[3] Watson v. Jones, 13 Wall. 679, 20 L. L.Ed. 666; Smith v. Swormstedt, 16 How. 288, 14 L.Ed. 942; Mack v. Kime, 129 Ga. 1, 58 S.E. 184, 24 L.R.A.,N.S., 675; Krecker v. Shirey, 163 Pa. 534, 30 A. 440, 29 L.R.A. 476; Fuchs v. Meisel, 102 Mich. 357, 60 N.W. 773, 32 L.R.A. 92; Finley v. Brent, 87 Va. 103, 12 S.E. 228, 11 L. R.A. 214; Fink v. Umsheid, 40 Kan. 271, 19 P. 623, 2 L.R.A. 146.

ties cited by him. With the law as contained in the cases cited, we are in accord generally. Plaintiff fails to apply those cases to the facts in this case.

We hold that the amendments to defendant's Charter were authorized and are legal and binding and do not constitute such a diversion of the trust as to authorize this Court to intervene; that neither plaintiff nor his class associates have such a vested interest in either the trust fund or its income as to constitute a basis upon which the complaint in this case can be sustained.

2. This leaves for determination that portion of the complaint wherein plaintiff seeks removal of defendant for mismanagement of the trust property. A short answer to this contention is that there is no evidence of mismanagement.

 While misconduct of the trustee or mismanagement of the trust estate is ground for removal of a trustee; "to warrant removal there must be such gross negligence or misconduct as to evidence the want of either capacity or fidelity, putting the trust in jeopardy". 65 C.J. 622, § 458, note 15; also see Mississippi Valley Trust Co. v. Buder, 8 Cir., 47 F.2d 507, loc. cit. 511, where the Court said:

"Some of the accepted rules which govern in determining applications for the removal of trustees are well expressed in 1 Perry on Trust (7th Ed.) § 276: 'In no case ought the trustee to be removed where there is no danger of a breach of trust and some of the beneficiaries are satisfied with the management. Nor will a trustee be removed for every violation of duty, or even breach of trust, if the fund is in no danger of being lost. The power of removal of trustees appointed by deed or will ought to be exercised sparingly by the courts. There must be a clear necessity for interference to save the trust property. Mere error, or some breach of trust, may not be sufficient; there must be such misconduct as to show want of capacity or of fidelity, putting the trust in jeopardy.' See, also, 3 Story Eq. Jur. (14th Ed.) § 1701; 4 Pom. Eq. Jur. (4th Ed.) § 1086; Lewin on Trusts (13th Ed.) § 494."

Funds administered by the defendant consist of two accounts: One, the Endowment fund which contains approximately three and one-half million dollars; and the Conference Fund, created by the various Annual Conferences as it had been deposited with the Trustee by them. This fund has approximately two and one-half million dollars in it. Income from the Endowment or General Fund is distributed direct to pensioners by the defendant. Income from the Conference Fund is paid to the pensioners through the Annual Conferences. No Annual Conference is represented among the complaining plaintiffs in this case.

Charge is made that the expense of administering the trust is excessive. It is doubtful if plaintiff has any interest in the expenditures for this purpose as all expense of administration is now paid by the World Service Committee. No expense of administration of the trust fund now comes from the income of the trust fund. The finances of the World Service Committee are raised to pay the expense of the various administrative units of the church. Since 1934 the expense of defendant's operations have amounted to a sum annually approximating 19% of the gross income from trust funds. However, the expenses of defendant cover other activities than administration of the trust fund. Much of the expense results from work done in promoting the raising of funds. Officers of the defendant visit the 34 Annual Conferences in its jurisdiction for the purpose of promoting campaigns to raise conference funds. The defendant supplies printing matter for these campaigns. The defendant solicits individuals for contributions to the conference fund. Defendant has 8500 ministers in its jurisdiction. Individual records are kept of various ministers by defendant, so that information helpful in passing upon applications for retirement pensions can be furnished to the Annual Conferences.

 Complaint is made by plaintiff of the character of securities purchased by the trust fund. A substantial loss was sustained in the trust fund of securities purchased prior to 1932. The exact amount does not appear from the record. It was placed at from $500,000 to $1,600,000. We cannot say that such a loss during the period involved proves mismanagement, in the absence of proof, other than the loss itself. Few, if any institutions, dealing in securities went through the depression of 1929 to 1932 without loss and substantial loss. This is a matter of such common knowledge that Courts should be aware of it. Under the present record of defendant in that respect its experience would probably compare favorably with some of the better managed financial institutions.

Plaintiff offered no evidence to the contrary. Aside from some securities carried over from that period the investments of defendant are characterized as of the "highest". Plaintiff did not cross examine the witness so testifying, to show otherwise. The gross income for 1943 on cost of securities in the trust was 3.8%, for the three year period prior to 1943 it was 4%. Particular objection was made by plaintiff to investment of his fund in stocks, as being contrary to the directions contained in acts of the general conference of the Methodist Episcopal Church, South. The general conference of that division of the Church authorized such character of investment on May 5, 1938. No evidence was offered of any investment of this type of securities by defendant prior to May 5, 1938. Such character of investments are not illegal. See Rand et al. v. McKittrick, 346 Mo. 466, 142 S.W.2d 29.

 The amount of pension received by plaintiff decreased during recent years. The only explanation of this offered, was a decrease in interest rate and increase in claimants of pensions, due to the action of the General Conference in 1942 making the retirement age seventy years. In 1942 the basis of pension was 76330 years and in 1943 this increased to 82515 years. Specifically the last distribution of plaintiff was on the basis of $1.75 per service year. The explanation for this decrease in income was plausible and no effort was made by the plaintiff to show such decreases reflected mismanagement on the part of defendant.

Complaint is made that the personnel of the management of the defendant is incompetent, inexperienced and not capable of discharging their duties. Upon the record before this Court we find the officers and investment committee of defendant are composed of men experienced in the business and Church world and contain men skilled (in so far as a man can be) in the selection of securities for investment.

 Plaintiff requests an audit. Regular audits are made of defendant's books by a recognized firm of auditors. There is no evidence of any complaint as to the form of these audits prior to the hearing in this case. If those charged with the responsibility of control and directions of the defendant have ever made a request for an audit or for a particular kind or character of audit which was not complied with or if complaint was made of the man-

ner in which the audits were conducted, this record does not show it. No cause has been shown that would justify this Court in ordering an audit of defendant's books concerning the trust fund.

Plaintiff's brief dwells at length on its charge of mismanagement—but the brief like the proof is of a most general nature. Not one single investment is pointed to as evidencing an illegal or improper investment of trust funds. Criticism is made of the bookkeeping methods—carrying securities at cost rather than market price. There is no evidence that the trust ever sustained any actual loss because of this practice. It is averred that the salaries of the officers of defendant are high. Considering their responsibility and the work carried on by them, this Court cannot say that salaries paid by defendant to its officers are high—even so, they are not a charge on the pension fund.

 Much of the complaint leveled at those engaged in administering the trust in support of plaintiff's plea that the defendant be removed as trustee, refers to a time long before the reorganization of defendant in 1940 and when the personnel of defendant's officers was entirely different from what it now is. While we find no basis for the request for removal of the trustee in the conduct referred to, yet it would be an act without precedent to remove the trustee because of things done by officers not now responsible for its conduct, by many years long past. These alleged acts of the defendant could on the other hand be properly considered in connection with the action of plaintiff in not only standing by while the things now complained of were transpiring with no objection; but of more importance; after this alleged "illegal" and "unlawful" reorganization of defendant and since that time to date, receiving a pension regularly from defendant. See the case of Hayes v. Manning, supra:

"For more than six months, therefore, plaintiffs with seeming approval not only acquiesced in the union, but personally participated in evident good faith in the various activities of the church. 'Actions,' says the homely adage, 'speak louder than words,' and no other reasonable construction of plaintiffs' conduct, measured by human experience, can be given than that they not only accepted, but approved the action of their judicatories in effecting the union. This acceptance and approval, while lack-

ing the essentials of estoppel, falls properly under the classification of a waiver. This court has said, not once, but many times, that no man is compelled to stand on a right given him by law. Henderson v. Koenig, supra [192 Mo. 690, 91 S.W. 88]; Williams v. Chicago, S. F. & C. Ry. Co., 153 Mo. [487], loc. cit. 519, 54 S.W. 689; Fulkerson v. Lynn, 64 Mo.App. [649], 653. Whatever this right may be, he may waive it if he chooses so to do, and, without agreement or consideration, and lacking the essentials of an estoppel, the waiver may be held to be valid and binding."

Holding the views here expressed, we do not deem it necessary to pass on whether plaintiff waived any right to complain of the amendments made to defendant's charter.

The amount involved in this case is large. The number of persons now or who may hereafter become interested in the pension fund is large. The income to each, however small it may be, is none the less a serious matter to them. Without doubt, knowledge of this suit has raised questions in the minds of the pensioners. For these reasons the Court has deemed it appropriate to set forth its views at length.

Plaintiff has failed in his proof. The bill is dismissed. Defendant will submit findings of fact and conclusions of law in accord herewith.